IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACE D. LUCERO,

        Plaintiff,

v.                                                CIV 11-0480 KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

# MEMORANDUM OPINION & ORDER

### I.  Introduction

THIS MATTER is before the Court on Plaintiff Jace Lucero's motion to reverse and remand the Administrative Law Judge's ("ALJ") decision that granted him supplemental income benefits but denied him disability benefits. *See Docs. 17, 21, 22.* Having carefully reviewed the Administrative Record ("Record") and the parties' positions, I grant the motion and remand the matter to the Administration for further proceedings.

### II.  Factual & Procedural Background

Plaintiff has been unemployed and homeless for over a decade. *See, e.g., Record* at 25, 44-49.[1] A prior filing for benefits was denied in 2006. *See id.* at 52-54, 56. In the subsequent applications at issue here that Plaintiff filed on March 6, 2008, he asserted his disability began

---

[1] Citations to the Administrative Record use the record pagination, not the CM/ECF designation and pagination.

on February 1, 2004, several months prior to his date last insured of September 30, 2004.  *See,*

*e.g., id.* at 10, 23, 115, 121.

The ALJ and Plaintiff's attorney recognized Plaintiff had few medical records, and they made efforts to locate any earlier ones.  *See id.* at 33, 55-56; *see also, e.g., id.* at 208 (Exhibit 3F – no medical records from Presbyterian Hospital). [2]  When the ALJ issued his decision, Plaintiff's medical records from 2002 to 2008 consisted of very few visits to Albuquerque Healthcare for the Homeless ("AHH") and one visit UNM University Hospital.  *See id.* at 193-205, 253-58 (Exhibits 1F, 2F, and 11F).  The records show Plaintiff complained of chest pain in May 2002, *id.* at 208, and an arm infection (and perhaps a cough) in August 2005, *id.* at 198, 200.  These records do not show that Plaintiff complained, or medical personnel made an observation, about mental health issues.

The first time a health care provider noted anything about Plaintiff's mental health was on October 28, 2008.  There, the typed notes list Plaintiff's "chief" complaints as insomnia and spasms.  *Id.* at 254.  However, the handwritten record provides Plaintiff indicated a "hx feeling depressed x yrs" and a "hx 'breakdowns' x 3 1994, 1997, 2006 – panic attack," and that he "feels sad, tired," "never been on anti-depressant," and "never has [illegible symbols] re: this."  *Id.* at 256.  Plaintiff also testified about his long-standing mental health issues.  See id. at  27-29, 39-45, 52-54.  For example, he testified that his 1997 breakdown was accompanied by a suicide attempt.  *See, e.g., id.* at 44.  The ALJ specifically found Plaintiff's "testimony of depression

---

[2]  Plaintiff noted that an unsigned, and different, version of the ALJ's decision appeared in the Administration's record.  Counsel therefore attached a copy of the signed version he received to Plaintiff's motion.  *See Doc. 17* at 3-4 (attaching Doc. 17-1).  The Administration cured the problem by using the version Plaintiff attached in the Modified Administrative Record it submitted for the Court's review.  *See Doc. 20* at 1 ("Modified Transcript lodged herewith replaces the original transcript"); *Doc. 20-3* at 7-20 (using pages 1-14 of Doc. 17-1).

with symptoms of poor concentration and difficulty maintaining appropriate interactions is credible." *Id.* at 16.

In the record before the ALJ, Plaintiff's earliest consultative mental status examination was conducted in May 2008 by Dr. Louis Wynne, *see id.* at 209-13, who concluded Plaintiff:

> cannot read and understand basic written instructions, and his concentration and ability to persist at simple work tasks is moderately impaired. He could not interact well with the general public, and he would have difficulty interacting with his coworkers and his supervisors. He also might have difficulty adapting to changes in the work place.

*Id.* at 211; *see also id.* at 226.

When Plaintiff was tested in September 2009, his "WAIS-IV" scores revealed a worse prognosis, with his "full scale" score of 73 putting him in the borderline range of intellectual functioning. His specific low average scores for perceptual reasoning and working memory (84, 83) scaled him as performing better than, at most, 14% of his peers. His borderline scores for verbal comprehension and processing speed (70, 74) scaled him as performing better than, at most, 4% of his peers. His mental status examination at that time revealed, among other things, poor concentration, fearful thoughts, poor task completion, poor judgment, poor insight, and limited coping skills. *See, e.g., id.* at 265-73.

Indeed, in light of this evidence, the ALJ gave the state agency physician's assessment that Plaintiff was only "moderately" or "not significantly limited" in his mental functioning "little weight." *Id.* at 17; *see also id.* at 228-30. The ALJ found that the test results, coupled with Dr. Wynne's consultative mental status examination and Plaintiff's testimony, supported the finding that Plaintiff's mental impairments rendered him unable to "engage in sustained work activity on a regular and continuing basis." *Id.* at 16; *see also id.* at 17. Plaintiff's limited

education and ability to communicate, and no functional capacity for work, led the ALJ to find Plaintiff disabled under the Medical-Vocational Guidelines alone, without the need to call a vocational expert. *Id.* at 17-18. Also, consistent with his finding that Plaintiff was credible, the ALJ found the former and long-standing "substance use" that Plaintiff testified was now behind him, was not a "contributing factor material to the determination of disability." *Id.* at 19.

As for the onset date, the ALJ concluded it was "March 6, 2006, the protective filing date" of Plaintiff's applications, *id*. at 11, because Plaintiff's mental impairment "***most likely*** existed for more than six to eight months before" he filed his applications, *id.* at 17 (emphasis added). The ALJ based this conclusion on Plaintiff's testimony, the first medical note of a mental impairment in October 2008, and the reports of the consultants who examined and tested Plaintiff. *Id.* Even though the ALJ credited Plaintiff's testimony, which included asserting mental health problems of long-standing, the ALJ refused to find that Plaintiff had a "severe" mental impairment before his date last insured because Plaintiff had no medical records showing "a diagnosis of depression or treatment or counseling for depression" for that time frame. *See id.* at 17. Thus, although the ALJ concluded Plaintiff suffers a severe disabling mental impairment, he also partially rejected the claim at Step 2 of the analytical process:

> there are absolutely no medical records in the record to document the presences of a "severe" medically determinable condition present prior to September 30, 2004. . . .
>
> * * * * *
>
> Absent objective medical evidence, the claimant's symptoms alone cannot establish the existence of a medically determinable physical or mental impairment. . . . Thus, regardless of how genuine the claimant's complaints may appear to be, when there are not medical signs or laboratory findings or record treatment to substantiate the existence of a medically determinable . . . mental impairment that could reasonable be expected to

> produces the claimant's symptoms, a finding of disabled is not justified (20 CFR 404.1529 and SSR 9604p).

*Id.* at 14.

The Appeals Council summarily affirmed and this appeal followed. *See, e.g., id.* at 1-3; *Doc. 21* at 3. Plaintiff asserts that the ALJ erred in not finding him "disabled on or prior to his date-last-insured," and thus, that Plaintiff is not "eligible for approximately $400/month more [in disability benefits] than he now receives on SSI." *Doc. 17* at 2.

### III. Analysis

While the Court is sympathetic to the difficulties presented by the lack of medical records for a claimant who has been out of work and homeless for over a decade, the ALJ's onset analysis does not apply the correct legal standards and is not supported by substantial evidence. Either deficiency is independent grounds for remand. *See, e.g., Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004).

The claimant bears the burden at Step 2, but that burden is *de minimis,* designed "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Bowen v. Yuckert,* 482 U.S. 137, 156 (1987) (O'Connor, J., concurring); *see also e.g., Langley v. Barnhart,* 373 F.3d 1116, 1123 (10th Cir. 2004) (burden *de minimis*). An impairment is "severe" if it "significantly limits" Plaintiff's "mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, "[a]s long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step. *Dray v. Astrue,* 353 F. App'x 147, 149 (10th Cir. 2009).

Finding that Plaintiff's mental condition is severe at Step 2 for some purposes, but not others, is internally inconsistent. The Tenth Circuit has held that scores in the borderline range constitute a "severe" impairment as a matter of law.

> In *Cockerham v. Sullivan,* 895 F.2d 492, 496 (8th Cir. 1990), the Eighth Circuit stated as follows: "[a] claimant whose alleged impairment is an I.Q. of 70-79 inclusive *has alleged a severe impairment* and may be considered disabled after consideration of vocational factors" (emphasis added). This circuit has followed *Cockerham* in two unpublished decisions. *See Fries v. Chater,* No. 96-2047, 1997 WL 31561, at * *2 (10th Cir. Jan. 28, 1997); *Turner v. United States Dep't of Health & Human Servs.,* No. 94-6202, 1995 WL 339402, at * *4 (10th Cir. June 7, 1995). We will now follow it in this case as well.
>
> In light of *Cockerham,* the ALJ erred as a matter of law in deciding that appellant's low IQ scores (the lowest of which was only 76) [FN1] did not constitute a severe impairment and did not warrant consideration in determining what work he could do. For this reason, we must reverse the district court's decision in part and remand for the limited purpose of having the ALJ conduct further analysis of the effect of appellant's IQ scores on his RFC and his ability to perform work in the national economy.
>
>> FN1. The Listings related to IQ require the Commissioner to look at the *lowest* valid IQ score. *See Hinkle v. Apfel,* 132 F.3d 1349, 1351 (10th Cir.1997). The same procedure is followed when assessing severity of the impairment. *See Cockerham,* 895 F.2d at 495 n. 5.

*Callins v. Apfel,* No. 98-6415, 2000 WL 6193, at * 3 (10th Cir. Jan. 6, 2000); *compare Miller ex rel. Thompson v. Barnhart,* 205 F. App'x 677, 679 (10th Cir. 2006) (distinguishing *Cockerham,* where claimant had "Full-Scale IQ of 81 on the WISC-III [which put her] in the 'Low Average range of intellectual ability'" and other tests put her "performance in many categories . . . within the average range of the national percentile ranks").

Furthermore, Social Security Ruling 83-20 does note that, as the ALJ acknowledges, for progressive impairments, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," and an "onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." *Id.* at 16; *see also, e.g.,* SSR 83-20, 1983 WL 31249, at *2, *3 (1983). However, the medical evidence developed by the Administration during the course of these proceedings objectively establishes the impairment that the ALJ found severe and entirely disabling. Ruling 83-20 does not, by its terms, permit the inquiry to end at Step 2 or to rest an onset decision entirely on the absence of medical care.

The Tenth Circuit's decision in *Blea,* which originated from this District, explains that:

> SSR 83-20 states that "[i]n disabilities of nontraumatic origin, the **determination of onset involves consideration of the applicant's allegations, work history,** if any, and the medical **and other evidence concerning impairment severity."** *Id.* The date alleged by the claimant is the starting point for determining disability onset, and the date the claimant stopped working is also of significance in selecting the onset date. *Id.* Medical evidence, however, is the "primary element" for the onset determination, as the onset date "can never be inconsistent with the medical evidence of record." *Id.* at 2-3.
>
> SSR 83-20 also provides that, when medical evidence does not establish the precise onset date, the ALJ may have to "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id.* at 2. **The regulation provides two examples of situations where it may be necessary to infer an onset date:** (1) in the case of a slowly progressing impairment, "when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available," and (2) **when "onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination."** *Id.* at 3. "At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred." *Id.*

*Blea v. Barnhart,* 466 F.3d 903, 909-10 (10th Cir. 2006) (emphasis added). In other words, "SSR 83-20 . . . ***requires*** the assistance of a medical advisor whenever 'onset' must be inferred." *Id.* at 910, n.5 (emphasis added) (as is the situation here, in *Blea,* the Commissioner construed 83-20 to require a medical consultant "if the onset of a disability occurred prior to the date of the first recorded medical examination"). And, an ALJ may not make "negative inferences against [a claimant] due to the gap in the medical record," *id.* at 913, for example, as here, where a claimant "sought no medical treatment during an eighteen-month period that included his last insured date," *Bigpond v. Astrue,* 280 F. App'x 716, 718 (10th Cir. 2008).

Other courts do not permit an ALJ to circumvent the requirements of 83-20 by denying the claim at Step 2. In *Newell,* for example, the Third Circuit held that the ALJ erred in denying benefits at Step 2 based on a lack of objective medical evidence for treatment of various conditions before date claimant's eligibility for widow's benefits expired. It noted that "several courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled," among them the Ninth Circuit where it held "the fact that a 'claimant may be one of the millions of people who did not seek treatment for a mental disorder until late in the day' was not a substantial basis to reject that an impairment existed.'" *Newell v. Commissioner of Social Security,* 347 F.3d 541, 547 (3rd Cir. 2003) (quoting *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996)).

The Third Circuit further noted that Social Security Ruling 96-7p "states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.'" *Id; compare*

*The Losen v. Astrue,* No. CIV.A. 07-6140JAP, 2009 WL 2148071, at * 12 (D.N.J. July 16, 2009) ("Here, the rationale for requiring the ALJ to consult a medical advisor in *Walton, Beasich,* and *Newell* is not present.  Unlike the ALJ in those three cases, the ALJ in the instant case had access to and considered an abundance of medical records from the time period prior to the expiration of The Losen's insured status.").

While Ruling  96-7p applies to assessments of a claimant's credibility, and the ALJ here did find Plaintiff credible, it is instructive because it discusses evaluating credibility in the absence of objective medical evidence.  *See* SSR 96-7p, 1996 WL 374186, at *3, *6 (July 2, 1996) (recognizing that a claimant's statements about symptoms "can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," setting forth factors an ALJ "must consider in addition to the objective medical evidence").  "The fact that '[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services' is a legitimate excuse" for a lack of, or infrequent, medical treatment.  *Madron v. Astrue,* 311 F. App'x 170, 178 (10th Cir. 2009) (quoting SSR 96-7p, 1996 WL 374186, at * 8).

The evidence developed by the Administration does not establish whether Plaintiff's disabling mental impairment existed before the date last insured, and thereby renders the available medical evidence ambiguous.  Due to the dearth of medical records, the onset date will have to be "inferred," and requires the services of a medical advisor to assist the ALJ in making the decision.  For these and all other reasons set forth by Plaintiff in his motion and reply, this matter must be remanded.  *See Docs. 17, 22.*

Wherefore,

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to remand *(Doc. 17)* is GRANTED, and this matter REMANDED to the Commissioner for further proceedings.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE